**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| UNIVERSITY ACCOUNTING SERVICE LLC,<br><br>                Plaintiff,<br>v.<br><br>SCHOLARCHIP CARD LLC,<br><br>                Defendant. | Case No. 17-CV-901-JPS<br><br><br><br>**ORDER** |

       The parties in this case, University Accounting Service LLC ("UAS") and ScholarChip Card LLC ("ScholarChip"), negotiated contracts concerning cloud-based software ScholarChip developed for UAS. UAS alleges that ScholarChip breached their agreements. ScholarChip has moved to dismiss the complaint, arguing that this Court lacks personal jurisdiction over it. For the reasons stated below, the motion must be granted.

**1.    LEGAL STANDARD**

       Under Federal Rule of Civil Procedure 12(b)(2), a party may move to dismiss on the ground that the court lacks jurisdiction over it. Fed. R. Civ. P. 12(b)(2). The plaintiff bears the burden of establishing personal jurisdiction when the defendant contests it. *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014). However, in cases such as this one, where the matter is decided on a motion to dismiss and without an evidentiary hearing, the plaintiff "'need only make out a *prima facie* case of personal jurisdiction.'" *Id.* (quoting *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002)).

Unlike some other challenges to a plaintiff's complaint, when questions of personal jurisdiction arise, the Court may consider affidavits and other evidence outside the pleadings. *Purdue Research Found. v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). Indeed, it can "accept as true any facts contained in the defendant's affidavits that remain unrefuted by the plaintiff." *GCIU–Employer Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009). Nevertheless, the court will "accept as true all well-pleaded facts alleged in the complaint and resolve any factual disputes in the affidavits in favor of the plaintiff." *Purdue*, 338 F.3d at 782.

**2.     RELEVANT FACTS**

The operative facts, drawn from the second amended complaint and the parties' evidentiary submissions, are as follows.[1] UAS, a Wisconsin limited liability company, is a student loan servicer, and its customers—both lenders and borrowers—are located across the country. Its principal place of business is and always has been in Wisconsin.

UAS was owned by Outsourcing Solutions Inc. ("OSI"), a Missouri corporation, until 2008, when it was sold to NCO Group, Inc. ("NCO"), a Pennsylvania corporation. In late 2014, UAS was sold again, this time to Platinum Equity, a private equity firm based in California, which also owns Transworld Systems, Inc. ("TSI"), a national debt collection agency. UAS was made a wholly owned subsidiary of TSI. TSI was incorporated in

---

[1]ScholarChip opens its brief by arguing that UAS's complaint fails to allege sufficient facts to establish personal jurisdiction. (Docket #27 at 12–13). While this may be true, ScholarChip admits that evidence outside the four corners of the complaint may be leveraged to demonstrate that jurisdiction exists once it is challenged. *Purdue*, 338 F.3d at 782. And a plaintiff is not required to plead facts establishing personal jurisdiction in anticipation of an attack thereon. *Id.* Thus, ScholarChip's concern with the facial sufficiency of the complaint is irrelevant.

California, and during the relevant period its principal place of business was in Illinois.

ScholarChip, founded in 2000 by Dr. Maged Atiya ("Atiya"), is a New York LLC with its principal place of business in Hicksville, New York. ScholarChip provides and hosts software for use in education markets. ScholarChip does not maintain any offices in Wisconsin; it does not maintain any accounts in a financial institution in Wisconsin; it does not own, lease, or otherwise occupy any real property in Wisconsin; it does not pay taxes in Wisconsin; it has never initiated a lawsuit in Wisconsin; and it is not listed in any telephone or business directories in Wisconsin. Further, ScholarChip does not do business with any entity in Wisconsin other than UAS. While ScholarChip runs national mass-marketing efforts directed at K–12 school administrators, including letters and emails, it has never specifically targeted Wisconsin with those efforts.

UAS's relationship with ScholarChip began in 2001. At that time, Lori Bennett ("Bennett"), then Director of Information Technology Operations at UAS, reached out to Atiya by telephone to request that ScholarChip build UAS an online electronic payment portal to process student loan payments. ScholarChip agreed, and the parties regularly corresponded via letter, telephone, and email about the portal. ScholarChip provided ongoing maintenance services and training related to the portal to UAS employees. Through servicing this portal, ScholarChip learned that UAS had some customers in Wisconsin, though the majority of its customers were located in other states.

In 2005, during a conference on platforms for servicing student loans in Wisconsin, UAS employees, including Bennett and others, met with Atiya and asked ScholarChip to convert UAS's existing portal into a new,

personalized software platform system (the "eUAS Software" or "the Software") on which UAS's client data would be hosted. Atiya agreed that ScholarChip would perform the conversion. Negotiations regarding the terms of the contract for these services began by telephone between Atiya in New York and an employee of OSI, which then owned UAS, in Ohio. No negotiations occurred in Wisconsin; instead, they occurred in Missouri, Ohio, and New York. Further, the negotiations took place only between ScholarChip and OSI, not UAS directly.

The deal was memorialized in three agreements, executed in March 2006: (1) the Master Terms and Conditions Agreement (the "MTC"), which established the terms pursuant to which ScholarChip would develop the eUAS Software; (2) the Software Development Agreement (the "SDA"), which had a 3-year term; and (3) the Hosting and Support Services Agreement (the "HSA"), which had a 2-year term with an option to extend the term by three years, for a total term of five years. These are referred to collectively herein as "the Agreements." Atiya executed the Agreements in New York. UAS's signatory was Gary Weller, an OSI employee who did not work in Wisconsin. However, the Agreements identify UAS as the contracting party and identify UAS's sole address as being in Brookfield, Wisconsin. Also of note, the MTC has a choice-of-law provision that selects Missouri law for the resolution of any disputes between the parties arising from any of the three contracts.

ScholarChip developed the eUAS Software as agreed. It was a cloud-based software platform, meaning that any UAS employee or customer could access the software remotely from any computer with an internet connection. ScholarChip's development work took place in New York. The hosting data center for the eUAS Software is located in the city of New York.

The methodology employed by ScholarChip to host that software, as well as the lender and student borrower customer data, is as follows: (1) the lender or student borrower customer sends information to ScholarChip's servers in New York; (2) ScholarChip's servers process the customer data into a readable format and, once processed, the data is made accessible via an internet browser; and (3) UAS customer service representatives access the customer data remotely.

UAS's servers that receive information generated from the eUAS Software platform were initially located in Wisconsin. However, within a few years of the Software's inception in 2006, UAS switched to using servers located in Horsham, Pennsylvania. (Those servers have since been moved to Las Vegas.) Since that time, no software information was delivered directly to Wisconsin because UAS no longer maintained any servers in Wisconsin that received information related to the eUAS Software or UAS lender or student borrower customer data. All of ScholarChip's ongoing servicing efforts took place from its offices in New York. However, when hard copies of documents were sent to UAS by borrowers, it would scan them in Wisconsin and transfer them electronically to ScholarChip for storage on the Software platform.

The Agreements required ScholarChip to give UAS daily copies of the data hosted on the eUAS Software. Additionally, ScholarChip agreed to provide continuing hosting, maintenance, support, development, and training services to UAS throughout the terms of the Agreements. ScholarChip was granted access to UAS's Wisconsin facilities to enable such work. ScholarChip also agreed not to interfere with UAS's access to the software, even if disputes arose between them. Finally, ScholarChip acknowledged that UAS owned the eUAS Software, and ScholarChip was

obligated to deliver to UAS all documentation and code for the Software, including the source code, object code, technical information, documentation, and derivative works of software, and deliver updated information as it arose. According to the Agreements, these obligations survive termination thereof.

For years, the parties' relationship continued amicably. ScholarChip provided ongoing maintenance, support, training, troubleshooting, and development services via telephone, email, and weekly webinars. As UAS grew more accustomed to the Software, the technical support and troubleshooting calls and correspondence subsided. Nevertheless, they did not die out completely. Additionally, the parties regularly exchanged information and data by electronic file transfer and email. *See* (Docket #37 ¶¶ 7, 13–14). Bennett avers that she herself had "many calls, email exchanges, and meetings with ScholarChip employees, including [Atiya]," since their work together began in 2001, including "routine calls" on troubleshooting and training after the eUAS Software was developed. *Id.* ¶¶ 4, 9. She also claims to have participated in calls related to "software development and related business strategy," though she gives no specifics about the contents of these discussions. *Id.* ¶ 10.

Further, Atiya traveled to Wisconsin approximately six times between 2006 and 2011 to meet with UAS representatives to discuss the development and servicing of the eUAS Software. Atiya avers that neither he nor any other ScholarChip employee visited Wisconsin after 2011. Additionally, ScholarChip represents that while it continued hosting training webinars for UAS after 2011, it was not obligated to do so under the Agreements.

ScholarChip maintains that higher-level contractual and business matters were not discussed with UAS during this time. Instead, those matters were directed to UAS's parent companies, including OSI, NCO, TSI, and Platinum Equity. None of these firms was organized in or has its principal place of business in Wisconsin. These sorts of negotiations were, according to ScholarChip, related to extending the Agreements after they expired in 2011.

Moreover, says ScholarChip, it was never paid directly by UAS for its performance under the Agreements. However, Bennett avers that from the inception of the parties' relationship, ScholarChip has sent invoices for its services to UAS, although UAS's accounts payable department is in Pennsylvania. She also claimed that she sometimes negotiated the specifics of an invoice by phone or email from her office in Wisconsin.

The parties' relationship eventually soured, but they disagree on who was to blame. In November 2014, the parties agreed to extend the hosting and other services under the Agreements until December 2015. UAS alleges that in December 2015, ScholarChip "demanded a new long-term contract with substantially increased fees in order for it to continue to provide hosting services under the terms of the Agreements." (Docket #23 ¶ 18). ScholarChip sent UAS a letter in February 2016 threatening to stop all services under the Agreements on June 30, 2016. UAS caved under the pressure and agreed to increased fees under the existing Agreements in order to extend the term of the services beyond June 2016.

The parties also agreed to temporarily extend the existing Agreements while they negotiated an entirely new contract. Those negotiations failed, however, and their final in-person meeting occurred on

February 9, 2017 in New York. Several telephone calls and letters after that date did not change matters.

UAS claims that ScholarChip has not provided it with all data and documentation related to the Software, despite its obligation to do so under the Agreements and despite UAS's continuing compliance with its payment and other obligations under the Agreements. Essentially, UAS believes that ScholarChip is holding the Software and its data hostage in order to ensure that the renewed negotiations turn out favorably for ScholarChip. As UAS tells it, "[b]ecause the Agreements remain effective, ScholarChip remains obligated to provide UAS's [d]ata to UAS upon demand. UAS's unfulfilled requests for its [d]ata precipitated this lawsuit." (Docket #36 at 11) (internal citation omitted).

ScholarChip, through Atiya, recalls events differently. On September 22, 2015, Atiya was invited by UAS and TSI (the then-owner of UAS) executives to meet with them in Chicago to discuss extending the Agreements. During the meeting, UAS told Atiya that it wished to terminate its relationship with ScholarChip and de-convert from the eUAS Software platform. Nevertheless, throughout 2016 the parties continued to negotiate in an effort to salvage their arrangement and extend the Agreements. This included several visits by a top executive at Platinum Equity to Atiya in New York. It also included the February 9, 2017 meeting between UAS executives and Atiya, also in New York, to discuss proposed amendments to the Agreements.

UAS's second amended complaint raises ten different causes of action arising from the breakdown in its relationship with ScholarChip. The claims fall into two general camps. The first is found in Counts Two and Three, which focus on ScholarChip's purported failure to continue to

provide the full scope of hosting, maintenance, and support services under the Agreements, which UAS alleges are still in effect. (Docket #23 ¶¶ 39–56).[2] The second group of claims, which includes the remaining eight counts of the complaint, are directed not at ScholarChip's hosting services but at its refusal to turn over the data and documentation about the eUAS Software to which UAS believes it is entitled to under the Agreements. *See id.* ¶¶ 29–38, 57–112.

3. **ANALYSIS**

Personal jurisdiction refers to a court's power over parties, in contrast to its subject-matter jurisdiction, which is its power over certain types of claims. When, as here, the Court exercises diversity jurisdiction over the claims in the case, the Court will exercise personal jurisdiction over a nonresident defendant only if a court of the state in which it sits would do so. *Purdue*, 338 F.3d at 779. This normally entails a two-part analysis, where the court first asks whether the state's long-arm statute encompasses the defendant's conduct, then considers whether exercising personal jurisdiction in the case at hand would comport with principles of due process. *Id.*[3] However, because the Court finds that constitutional

---

[2]Despite demanding that ScholarChip continue to host the Software, it is clear that UAS wants to take its business elsewhere and convert to another software platform. *See* (Docket #27 at 19).

[3]Wisconsin's long-arm statute, Wis. Stat. § 801.05, is liberally construed in favor of conferring jurisdiction, *Kopke v. A. Hartrodt S.R.L.*, 629 N.W.2d 662, 670 (Wis. 2001), and the Seventh Circuit has interpreted this to mean that Section 801.05 extends Wisconsin's jurisdictional reach to the maximum extent permitted by due process, thus merging the statutory and constitutional inquiries into one, *Felland v. Clinton*, 682 F.3d 665, 678 (7th Cir. 2012). Nevertheless, courts following *Felland* have expressed doubt about that holding, noting that Wisconsin courts themselves do not collapse the statutory and constitutional analyses. *See U.S. Venture Inc. v. McCormick Transport LLC*, No. 15–C–990, 2015 WL 6694031, at *2–3

considerations alone compel dismissal of this case, it declines to address the statutory question.

The Due Process Clause protects a defendant from being haled into court in a state where it has no meaningful connections. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 464 (1985). Due process requires that for personal jurisdiction to exist over a nonconsenting, out-of-state defendant, the defendant must have "certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash., Office of Unemployment Compensation & Placement*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

There are two types of personal jurisdiction—general and specific—that can satisfy the strictures of due process. *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414–16 (1984). General personal jurisdiction requires that the defendant have "'affiliations with the State [that] are so 'continuous and systematic' as to render [the defendant] essentially at home in the forum State.'" *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). If such contacts exist, "the court may exercise personal jurisdiction over the defendant even in cases that do not arise out of and are not related to the defendant's forum contacts." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). Such robust contacts usually appear only in the

---

(E.D. Wis. Nov. 3, 2015). For *Felland*, the distinction did not matter much. There, the two-part inquiry merged into one because the facts satisfied both the statutory and constitutional requirements, obviating any need to discuss what differences there might be between the two. Here, the distinction is irrelevant because due process, and not the long-arm statute, is what obliges the Court to dismiss the case.

corporation's state of incorporation and its principal place of business. *Goodyear*, 564 U.S. at 924.

Specific personal jurisdiction, by contrast, exists where the suit before the Court arises from or relates to the defendant's contacts with the forum State. *Helicopteros*, 466 U.S. at 414; *Int'l Shoe*, 326 U.S. at 317–18. This type of personal jurisdiction is more limited than general personal jurisdiction, which, if established, means that the defendant can be sued on any claim in the forum State. *See Daimler*, 134 S Ct. at 754. Specific personal jurisdiction exists only where the defendant's contacts with the forum state "directly relate to the challenged conduct or transaction." *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010).

To establish specific personal jurisdiction, there must be "some act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958); *Burger King*, 471 U.S. at 474–75. To answer this question, the Court must examine the "relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977). A defendant must have sufficient contacts with the forum, related to the suit at bar, that it "should reasonably anticipate being haled into court [in the forum State]" on that suit. *Burger King*, 471 U.S. at 474.

Crucially, the "mere fact that [the defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." *Walden v. Fiore*, 134 S. Ct. 1115, 1126 (2014). Rather, the Court must query whether the defendant himself purposefully created or initiated the relevant contacts with the forum. *Id.* at 1122; *Burger King*, 471 U.S. at 475. In contract cases, an out-of-state party's contract with an in-state party is

not enough, standing alone, to establish the requisite minimum contacts. *Burger King*, 471 U.S. at 478. However, "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" may indicate the purposeful availment that makes litigating in the forum state foreseeable to the defendant. *Id.* at 479.

Applying these principles, the Court now turns to consider the asserted bases for personal jurisdiction over ScholarChip in this case.

### 3.1 General Personal Jurisdiction

Undoubtedly, ScholarChip is not subject to general personal jurisdiction in Wisconsin. It was not organized here, has no office or other property here, has no registered agent here, does not house any servers or host any software here, has no financial accounts here, and indeed has no lasting connection to Wisconsin outside its relationship with UAS. As a result, there can be no dispute that ScholarChip has no "continuous and systematic" contacts in this jurisdiction, and it is therefore not "at home" here. *Daimler*, 134 S. Ct. at 761.

"The threshold for general jurisdiction is high; the contacts must be sufficiently extensive and pervasive to approximate physical presence." *Tamburo*, 601 F.3d at 701. ScholarChip's contacts with Wisconsin fall well short. Indeed, since ScholarChip has no connection to Wisconsin unrelated to UAS, it would be mightily unfair to hale it into to Wisconsin "to answer for any alleged wrong, committed in any place, no matter how unrelated to the defendant's contacts with the forum." *uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 426 (7th Cir. 2010); *Purdue*, 338 F.3d at 788 (to give rise to general personal jurisdiction, a party's contacts with the forum "must be so extensive to be tantamount to [it] being constructively present in the state

to such a degree that it would be fundamentally fair to require it to answer in [a forum state] court in *any* litigation arising out of *any* transaction or occurrence taking place *anywhere* in the world.") (emphasis in original). Nothing in the facts presented suggest that this is a case ripe for a departure from the usual paradigm that general personal jurisdiction only arises in a corporation's state of incorporation and principal place of business. *Goodyear*, 131 S. Ct. at 2853.

Nevertheless, UAS makes a confused attempt to import some principles of general personal jurisdiction into its analysis. Its first argument is that personal jurisdiction is appropriate under Wis. Stat. § 801.05(1)(d), which extends personal jurisdiction over defendants who are "engaged in substantial and not isolated activities within this state, whether such activities are wholly interstate, intrastate or otherwise." Wis. Stat. § 801.05(1)(d). What UAS fails to realize is that this State's long-arm statute contemplates both general and specific personal jurisdiction, and Section 801.05(1)(d) is simply a codification of well-settled principles of general personal jurisdiction. *See Rasmussen v. Gen. Motors Corp.*, 803 N.W.2d 623, 633 (Wis. Ct. App. 2011); *Stifel, Nicolaus & Co., Inc. v. Harkness*, Case No. 17–cv–222–pp, 2017 WL 3670016, at *1 (E.D. Wis. Aug. 24, 2017). There being no genuine possibility that ScholarChip is subject to general personal jurisdiction in this State, no more need be said about it or Section 801.05(1)(d).

### 3.2 Specific Personal Jurisdiction

Moving on to the more pertinent question of specific personal jurisdiction, the Court concludes that ScholarChip cannot be subject to suit in this Court for claims arising from breach of its obligations under the Agreements. While some minor aspects of ScholarChip's contractual duties

touch upon Wisconsin, the principal reason Wisconsin is involved is because UAS is located in this State. This is not a viable basis upon which to hale ScholarChip into this State's courts.

The parties' contracts contemplate primarily the development and hosting of an internet-based software platform, both of which indisputably occurred outside Wisconsin. Those services revolved around New York, where ScholarChip developed the Software and hosted it. With the end users scattered across the entire country and accessing the Software through the omnipresent internet, it cannot be said that the hosting service has a real and substantial connection to Wisconsin. At best, the hosting-related contractual duties have far-flung, fortuitous downstream sites. *See Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014). Moreover, although Atiya himself traveled to Wisconsin on several occasions to meet with UAS staff about the Software, this is but one consideration among many, and it is undisputed that ScholarChip employees have not entered Wisconsin in many years.

More importantly, the thrust of UAS's entire suit—indeed, eight out of its ten claims—concerns the delivery of data and documentation about the Software. Neither the Agreements nor the complaint say anything about where that data and documentation was to be sent. Bennett averred that for a time, this information was sent to servers in Wisconsin. However, for the majority of the existence of the eUAS Software, the relevant data was sent to servers in Pennsylvania, not Wisconsin. Thus, for the bulk of the relevant time period, ScholarChip cannot even be charged with directing data-delivery activity into the forum state. *See Purdue*, 338 F.3d at 781.

UAS counters it always accessed the data remotely from Wisconsin, and that ScholarChip knew this. (Docket #36 at 25). But it was UAS's choice

to use out-of-state servers, making this case unlike *Stat Imaging, LLC v. Medical Specialists, Inc., P.C.*, No. 13 C 1921, 2013 WL 3811643, at *5–6 (N.D. Ill. July 22, 2013), which found personal jurisdiction was appropriate where the defendant had voluntarily agreed to transmit data to the plaintiff in the forum state through a web-based portal. In that case, the plaintiff accessed data processed by the defendant on the defendant's servers located in another state. *Id.* The same circumstance arose in *United Financial Mortgage Corp. v. Mortgage Connect, LLC*, No. 05 C 2521, 2005 U.S. Dist. LEXIS 25075, at *11 (N.D. Ill. Oct. 26, 2005), where the defendant hosted software on out-of-state servers which the plaintiff accessed remotely. Different from *Stat Imaging* and *United Financial*, in this case ScholarChip is not unfairly recasting its own actions as UAS's unilateral activity.

For UAS's software hosting and data-delivery claims, the only meaningful connection ScholarChip has to Wisconsin is UAS's presence here. To satisfy due process, a defendant must be found to reach out into the forum state and make its own connections there relating the claims asserted against it. *Walden*, 134 S. Ct. at 1122. The *Walden* Court instructed in no uncertain terms that "the plaintiff cannot be the only link between the defendant and the forum." *Id.* The "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.*; *see also Priority Envir. Sol., Inc. v. Stevens Co. Ltd.*, Case No. 15-CV-871-JPS, 2015 WL 9274016, at *7 (E.D. Wis. Dec. 18, 2015).

UAS's presence in Wisconsin is not relevant to the development, hosting, or data-delivery services it purchased from ScholarChip, since it could just as easily uproot to Alaska, Alabama, or any other state, without ScholarChip's involvement. Because "[d]ue process requires that a

defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State," *Walden*, 134 S. Ct. at 1122, UAS's choice of location cannot control in this instance.

Certain minor obligations contemplated in the Agreements, including support and training services attendant upon the Software, offer slightly more concrete connections to Wisconsin. Those services were provisioned to Wisconsinites by phone, email, and webinar. But these were ancillary, and they form a basis for only a tiny sliver of UAS's claims. At best, these connections to Wisconsin can be described "extremely limited," whereas the Agreements, considered holistically, contemplated primarily out-of-state performance. *See Doctors Oxygen Serv.*, 2015 WL 1932073, at *6; *Federated Rural Elec. Ins. Corp. v. Inland Power & Light Co.*, 18 F.3d 389, 393 (7th Cir. 1994) (insurance contract underlying the dispute did not contemplate any action being taken in Wisconsin and the insured's business was located solely in the Pacific Northwest).

In other words, the contractual provisions creating the training and support duties, and the subsequent performance of those duties, do not "demonstrate a real relationship with the state with respect to the transaction at issue." *N. Grain Mktg.*, 743 F.3d at 493. Contrast this case with *Golden Archer Investments, LLC, v. Skynet Financial Systems*, No. 11 Civ. 3673(RJS), 2012 WL 123989, at *5 (S.D.N.Y. Jan. 3, 2012), cited by UAS, where the court found that continuing exchanges between the parties about software development gave rise to personal jurisdiction. Those communications were related to "the heart of the commercial transaction between the parties." *Id.* Here, however, UAS clings to training and support

communications while ignoring that the scope of the contracts was far broader.[4]

Furthermore, it is largely undisputed that higher-level contract negotiations occurred between ScholarChip and UAS's parent companies, not UAS. The parties quibble over signatories and email addresses, but UAS fails to dispute that its parents led the negotiations regarding the Agreements. Indeed, to the extent UAS had a hand in the negotiations, it militates against the exercise of jurisdiction here. Without doubt, UAS initiated the negotiations, both originally, in 2001, and for the present Agreements, in 2006, and none of the talks or ultimate execution occurred in Wisconsin. (Docket #27 at 18–19). UAS's decision to initiate contact with an out-of-state entity cannot be used against ScholarChip in order to find a reason to exercise personal jurisdiction. *N. Grain Mktg.*, 743 F.3d at 494; *Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 53 (7th Cir. 1996). And, on top of all that, it is notable that the Agreements choose Missouri law to govern disputes concerning them, indicating that their connection with Wisconsin was insignificant. *Healthfuse LLC v. CDH Delnor Health Sys.*, Case No. 16-cv-560-pp, 2017 WL 927624, at *5 (E.D. Wis. Mar. 8, 2017).

Finally, contrary to UAS's belief that the length of the parties' relationship can carry the day, the Seventh Circuit in *Northern Grain* found

---

[4]This same reasoning offers further bases on which to distinguish *Stat Imaging*, 2013 WL 3811643, and *United Financial*, 2005 U.S. Dist. LEXIS 25075, discussed above. In those cases, the service being provided remotely was both at the center of the parties' dispute in the lawsuit and was the core contracted-for service. UAS has little or nothing to complain about with respect to ScholarChip's actual hosting service performed in New York, which was the primary aim of the Agreements. It is much more difficult to justify dragging ScholarChip into this Court over peripheral services like data delivery, training, and technical support, even if they were more closely linked to Wisconsin.

that even a nine-year contractual relationship with an in-state plaintiff was not enough, reiterating the principle that merely contracting with an in-state plaintiff is not equivalent to purposeful availment. *N. Grain Mktg.*, 743 F.3d at 496. Likewise, in *Purdue*, although the parties' sixteen-year relationship was relevant to the Seventh Circuit's conclusion that personal jurisdiction existed, other forum-based conduct by the defendant militated in favor of that conclusion that are not present here, such as contract negotiation, choice of law, and a substantial portion of the parties' joint pharmaceutical research. *Purdue*, 338 F.3d at 785. Thus, when considered against the bulk of the contractual duties lacking a connection to Wisconsin, ScholarChip's training and support obligations do not amount to a purposeful availment of conducting business in this State. *Hanson*, 357 U.S. at 253; *Purdue*, 338 F.3d at 781 (in contract cases, courts must employ "a 'highly realistic' approach and to place the contract in the context of the entire transaction of which it is a part") (quoting *Burger King*, 471 U.S. at 479). As a result, the Court concludes that ScholarChip lacks minimum contacts with this State, related to the claims at bar, sufficient to warrant the exercise of personal jurisdiction in this case.

In light of ScholarChip's negligible connections to this State, the Court further finds that exercising jurisdiction in this case would not comport with traditional notions of fair play and substantial justice. Several factors inform this determination: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477. Although merely having to

travel to defend oneself in a foreign jurisdiction is insufficient to defeat personal jurisdiction, *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994), it cannot be said that Wisconsin has a meaningful interest in adjudicating a dispute centered on the alleged non-performance of duties in other states, although the duties were owed to a Wisconsin company. Further, while UAS's own choice of forum is entitled to some degree of deference, *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981), paying too much heed to that choice would eviscerate ScholarChip's due process protections.

Finally, and most importantly, even if one assumed that a Wisconsin court was capable of adjudicating disputes about the training and support services ScholarChip provided to UAS, given that the main object of the suit has nothing to do with them, Wisconsin is neither a convenient forum for UAS nor the most efficient forum for resolution of the parties' disputes. Rather, it is clear to the Court that some other jurisdiction, perhaps ScholarChip's home jurisdiction of New York, would provide an effective location for a single suit to resolve all the pending claims. *See Tamburo*, 601 F.3d at 709. Parsing a tiny subset of claims for adjudication in this Court would contravene the goal of efficiency. Consequently, the Court finds that these fairness considerations militate against the exercise of jurisdiction in this case.

**4. CONCLUSION**

For the reasons stated above, the Court finds that UAS has not met its burden to show that the exercise of specific personal jurisdiction over ScholarChip is appropriate in this case. As a result, ScholarChip's motion to dismiss will be granted.

Accordingly,

**IT IS ORDERED** that Defendant's motion to dismiss for lack of personal jurisdiction (Docket #26) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED without prejudice** for lack of personal jurisdiction.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 27th day of October, 2017.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge